**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE**

| | |
|---|---|
| UNITED STATES OF AMERICA, e*x rel.* by BRENT STONE<br><br>Plaintiff,<br><br>vs.<br><br>YAKIMA PRODUCTS, INC., a Delaware Corporation ,<br><br>Defendants. | NO.  2:21 - cv - 00524 - JLR<br><br>AMENDED COMPLAINT and JURY DEMAND<br><br>**Filed Under Seal<br>(Do not enter on PACER)<br>pursuant to<br>31 U.S.C. §3730(b)(2)** |

COMES NOW the United States of America, by and through Brent Stone, *qui tam* as Relator, and for a cause of action alleges as follows:

### I. NATURE OF THE ALLEGATIONS

Yakima Products, Inc. has defrauded US Customs.  The amount in question, prior to penalties, is approximately $955,000, which is owed on certain extruded aluminum products imported from China.  These products are subject to Anti-Dumping Duties and Countervailing Duties. Yakima executive leadership intentionally chose to underreport and underpay (i.e., ignore and evade) these duties. These unreported duties were intentionally omitted from a "prior disclosure" submitted to customs to resolve a CF 28 request and a CF 29 notice issued to Yakima.

As a result, Yakima took advantage of unfairly low prices, which undercut other American

companies' competitiveness for these products, and committed fraud upon the Customs and Border Protection arm of the US Government to do so.

## I. JURISDICTION and VENUE

1.1   Jurisdiction exists pursuant to 31 U.S.C. §3730(b)(1) and 31 U.S.C. §3732 in that this action seeks remedies on behalf of the United States of America for violations of 31 U.S.C. §3729 by the Defendants.

1.2   On information and belief, the "allegations or transactions" upon which this suit is based have not been publicly disclosed in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit or investigation, or from the news media.  31 U.S.C. 3730(e)(4)(A).

1.3   To the extent they have been so disclosed, knowledge obtained by the U.S. Government was the result of a disclosure made by the Relator, including a disclosure on or about April 6, 2021 to the CBP Strategic Enforcement Branch of the Office of Trade, and the government's False Claims Act counsel.

1.4   The *qui tam* Plaintiff is an original source in that he "has direct and independent knowledge of the information on which the allegations are based."  31 U.S.C. §3730(e)(4)(B). He has been providing information through this litigation and has previously provided and offered to provide information to agents of the United States Government in connection with this matter.

1.5   Yakima Products, Inc. ("Yakima") is a Delaware Corporation which may be made up of or owned by other corporations, foreign or domestic.  This complaint is intended to cover those parts of Yakima and any related organization responsible for the fraud alleged herein.

1.6   "Yakima" transacts business in Seattle, Washington, within the Western District of Washington, as well as in other states of the United States of America, including Oregon where it has its principle place of business.  In the course of business, Yakima imports goods on which it is obligated to pay tariffs and duties to the US government, through Customs and Border

Protection.

1.7 Venue exists in this District pursuant to 31 U.S.C. §3730(b)(1) in that Defendants are qualified to do business in the State of Washington and do transact substantial business in the District, including sales of products in retail commerce.

## II. PARTIES

2.1 The Defendant Yakima is an Delaware corporation with its principal place of business at 4101 Kruse Way, Lake Oswego, Oregon, 97035-2541, and is engaged in the business of, *inter alia*, selling car racks, roof racks, bike racks, hitch racks and other products.

2.2 Relator Brent Stone resides in Oregon. He was Director of Operations for Yakima from June, 2018 through late September, 2020.

2.3 The United States Government is a party hereto. Specifically the US Customs and Border Protection agency ("Customs" or "CPB") is the department most directly involved in his matter.

## III. STATEMENT OF FACTS

3.1 As Director of Operations for Yakima from June, 2018 through late September, 2020 relator had business responsibility related to purchasing, importing, warehouse operations and logistics. Allegations herein are made based on his personal knowledge.

**A. Legal Requirements – Importer must identify, disclose, and pay duties**

3.1 Customs officials at United States ports of entry are unable to inspect every imported item. Instead they rely primarily on importers to self-report all duties owed, and to identify and report accurately on any entry of goods into the United States.

3.2 Importers of goods into the United States are required to declare said imports and pay any tariffs due. Such statements to Customs are required by law to be truthful and accurate, and may not contain material omissions.

3.3 For example, under Section 484 of the Tariff Act, as amended (19 U.S.C. 1484), the

AMENDED COMPLAINT AND JURY
DEMAND - 3

Teller Law
1139 34th Ave
Seattle, WA  98122
(206) 324-8969   Fax: 860-3172

importer of record is responsible for using reasonable care to enter, classify and determine the value of imported merchandise and to provide any other information necessary to enable U.S. Customs and Border Protection to properly assess duties, collect accurate statistics, and determine whether other applicable legal requirements, if any, have been met.  See also 19 USC §1592.

3.4    When importers find that they have inaccurately declared the tariff, they may make a "prior disclosure" of their error.

3.5    Prior disclosure is afforded to companies that disclose to Customs the circumstances of a violation of 19 USC §1592 before, or without knowledge of, a formal investigation of such violation, if they identify and tender the actual loss of duties, taxes and fees – the Customs Loss of Revenue – within the time period provided.

3.6    Providing such a statement requires that the disclosing party set forth to the best of the disclosing party's knowledge the true and accurate information or data that should have been provided regarding the entry.  19 CFR 162.74

3.7    Making a known false statement in a prior disclosure voids the advantages of the prior disclosure and subjects the importer (in this case the Defendant Yakima) to penalties and interest and other consequences in addition to the requirement to pay the tariff which was due.

**B.    Yakima Products Subject to ADD and CVD which went unpaid**

3.8    Yakima Products Inc. designs and manufactures racks for luggage, cargo, gear, and bicycles. Most of these products are mounted on or pulled behind automobiles.  The company imports various component parts and accessories to manufacture its products, including from China.

3.9    Certain Yakima products, including those made from extruded aluminum, were subject to anti-dumping and countervailing duties ("ADD/CVD").

3.10    Anti-dumping duties (ADD) and countervailing duties (CVD) are intended to protect the U.S. manufacturing industry from foreign manufacturers. Dumping occurs when foreign

manufacturers sell goods in the U.S. at less than fair value. Antidumping and countervailing duties are intended to offset the value of dumping and/or subsidization, thereby leveling the playing field for domestic industries injured by such unfairly traded imports.

3.11 In the relevant time frame, the United States imposed substantial AD and CV duties which affected Yakima part numbers 5021582, 5061818, 5122715, and 3860473 (RAIL, WB, BOX, Q2, SM, 1205MM), 3860331 (BAR, DRV, SHRT, SKYBOX), 3860332 (BAR, DRV, SHRT, SKYBOX), and 5062412 (CROSSBAR, JEEP), and, it appears, 3860324 (EXTR, BAR, AL, DD, .50X.075T), and likely most parts described as "RAIL", "BAR", "DRVR", "DRV", and "BOX". Most or all of the foregoing, and likely others are made from 6063 series extruded aluminum and are imported without being assembled with other components, and are subject to ADD and/or CVD.

3.12 These duties were identified as A-570-967 and C-570-968, and were published in the federal register as "Aluminum Extrusions from the People's Republic of China: Antidumping Duty Order," 76 Fed. Reg. 30,650 (May 26, 2011) and "Aluminum Extrusions from the People's Republic of China: Countervailing Duty Order," 76 Fed. Reg. 30,653 (May 26, 2011).

3.13 Yakima did not pay these duties on these parts.

**C. Details of the knowing and fraudulent failure to disclose and pay duties**

3.14 About a week after Relator was hired, on June 15, 2018, Customs issued a CF28 request for Yakima to provide information for items imported ("entries") on Jan. 30, 2018. Brenda Ferris was the CBP official on the request. On July 10, 2018, Customs issued a CF29 for entries on Jan. 31, 2018.

3.15 On July 30, 2018, Yakima communicated to CBP the choice to submit a comprehensive review and "prior disclosure" to address and resolve the CF 28 and CF 29 entries, engaging in a look back period from August 1, 2013 through August 1, 2018.

3.16 Yakima, by and through its counsel, submitted a statement of intention regarding the

AMENDED COMPLAINT AND JURY
DEMAND - 5

Teller Law
1139 34th Ave
Seattle, WA  98122
(206) 324-8969   Fax: 860-3172

1  prior disclosure in which it indicated it was aware, and certified, that the disclosure "Specifies the
2  material false statements, omissions or acts including an explanation as to how and when they
3  occurred," and "sets forth, to the best of the disclosing party's knowledge, the true and accurate
4  information or data that should have been provided."  A true and correct copy of said statement
5  is attached as Exhibit A hereto.

6      3.17   As is referenced below, these certifications were false.  Indeed, they were knowingly
7  false.  Yakima has no internal Customs Import Compliance Manual and knowingly uses
8  inadequate procedures, which failed to identify the ADD/CVD oversight initially.  Additionally,
9  Yakima specifically chose not to implement preventative measures after these events.

10      3.18  ████████████████████████████████████████████
11  ████████████████████████████████

12      3.19   The unpaid ADD/CVD comprised a Loss of Revenue to CBP of approximately
13  $955,000.

14      3.20  ████████████████████████████████████████████
15  ████████████████████████████████████████████████
16  ██████████████

17      3.21  ████████████████████████████████████████████
18  ████████████████████████████████████████████████
19  ████████████████████████████████████████████████
20  ████████████████████████████████████████████████
21  ██████████████████████████

22      3.22  ████████████████████████████████████████████
23  ████████████████████████████████████████████████
24  ███

25      3.23   Relator believes he was visibly uncomfortable with the interaction.  He was very

1  concerned, but did not fully realize the implications before speaking with the company's attorney,
2  George Tuttle, an experienced customs lawyer.  Additionally Relator knew that this might not be
3  the final decision.

4      3.24    Relator had no authority to push back against this choice without risking his job, but
5  did make clear to Yakima, including through Martin that he (Relator) was not the decisionmaker.
6  In truth, Relator was very concerned about this decision, and ultimately asked to withdraw from
7  the choice, telling Martin and Tuttle that he wanted "out of the middle" of the situation.

8      3.25    Around that time Mr. Tuttle started labeling communications as attorney client
9  privileged.

10     3.26    [REDACTED]
11 [REDACTED]
12 [REDACTED]
13 [REDACTED].

14     3.27    Relator knew that if Ms. Lennehan could not dissuade Mr. Martin, then certainly
15 Relator could not.  Throughout, Relator was concerned about the risk of retaliation.

16     3.28    By failing to include the ADD/CVD discovery in the prior disclosure, Yakima would
17 be committing fraud when it certified that its "prior disclosure" was accurate.  Additionally, the
18 removal of the parts subject to ADD and/or CVD would improperly alter the parameters of the
19 statistical sampling, voiding the representations in the Prior Disclosure.  Nevertheless, ultimately
20 Mr. Martin chose not to make the ADD/CVD disclosure despite the requirements of the Prior
21 Disclosure process.

22     3.29    [REDACTED]
23 [REDACTED]
24 [REDACTED]
25 [REDACTED]

███████████████████████████████████████

████████████████████

3.30    On information and belief, Ryan Martin approved the final version of the March 14, 2019 letter, without the ADD/CVD, for submission to CBP.

3.31    The final Prior Disclosure document, dated April 1, 2019 indicates:

> Yakima initiated an import compliance review of its products and tariff classifications used. The merchandise subject to this disclosure consists all products imported during the period of August 1, 2013 through February 25, 2019.

3.32    The final document does not disclose the ADD/CVD about which Yakima leadership was fully aware. A true and correct copy of the Prior Disclosure document is attached hereto as Exhibit B.

3.33    In other words, Yakima made a false certification that its review was comprehensive, covering "all products" and, pursuant to the terms of any prior disclosure, was accurate.

3.34    CBP, being ignorant of the true facts and having been misled by Yakima, accepted the prior disclosure as accurate and closed the matter, accepting substantially less in duties than Yakima actually owed for the period.

3.35    The proper measure of damages for the fraud referenced herein should include not only the unpaid tariffs on the products subject to ADD/CVD, but in addition due to the intentional and fraudulent abuse of the Prior Disclosure process, all items identified and disclosed therein should be considered as subject to penalties, interest, and duties and tariffs as if they had not been disclosed in a Prior Disclosure. Given the intentional fraud, the maximum multiplier should be applied.

3.36    This is unquestionably a knowing intentional fraudulent non-disclosure, and constitutes a blatant abuse of the Prior Disclosure process.

**J.    Country of Origin Issue – Chinese Goods Falsely Claimed as Taiwanese**

3.37    In spring 2018 in a series of memoranda under Section 301 of the Trade Act of 1974,

the President of the United States instructed the US Trade Representative to impose tariffs on Chinese goods. Goods with the Country of Origin of China were subject to an additional 25% tariff.

3.38   Yakima had been producing a large number of its products and parts in China, and would be substantially impacted by the change in tariffs. Yakima determined to move some assembly processes to Taiwan and report the country of origin as Taiwan instead of China in order to avoid paying these new tariffs.

3.39   These changes were not sufficient to change the country of origin to Taiwan, and the products are still subject to the 25% added tariff. Yakima has determined to fraudulently certify the Country of Origin as Taiwan when it should be China in order to avoid paying the additional tariff.

3.40   The country of origin of items in a global trade chain *can* change if the items are altered sufficiently in the course of production. For example, if raw metal ingots were shipped from China to Taiwan and fabricated into parts in Taiwan, the HTS codes for these items would legitimately change from one classification header to another, and the resulting parts could properly be consider exports from Taiwan.

3.41   Similarly, if the increase in value of the product between the import into Taiwan from China and the export to the US is very substantial, possibly as much as 50 percent (see Customs Ruling NY N306015, dated 9/20/2019 and cases cited therein), considering the labor, additional materials, and other value added, then the product may legitimately be said to come from Taiwan.

3.42   Kemflo, a Taiwanese company, and/or its owners the Lim family, own Defendant Yakima and also own two factories. One is located in Nanjing China and the other in Kaohsiung Taiwan. The Nanjing factory is run by the owner's son, Eugene Lim. The Taiwan factory is near where the owner, C.S. Lim, resides. The Taiwan facility also houses the finance team for both

factories.

3.43   Before the 2018 tariffs, the Nanjing China factory was manufacturing nearly 100% of the products for Yakima with the exception of a few items purchased from 3rd party suppliers. This factory has capabilities for fabricating parts from steel or aluminum including welding, bending or shaping, powder coating, etc.  These metal parts are the backbone of Yakima products.

3.44   In contrast, before the tariffs, the Kaohsiung Taiwan factory did not manufacture any similar bike rack products.  It was used to create water filter and water dispensing products, which are the result of different manufacturing processes and materials, and which require clean and dust free manufacturing capabilities incompatible with the heavier, dirtier China-based welding and powder coating processes.

3.45   Yakima claims to have moved the origin of the majority of their products to their Kaohsiung, Taiwan factory, but the work performed in Taiwan is limited to light assembly and packaging and is insufficient to alter the country of origin.

3.46   The majority of the products whose country of origin changed in the 2018/2019 time frame are falsely certified as Taiwanese when they are really of Chinese origin.

3.47   As Director of Operations, Relator was aware that the country of origin for many of Yakima's imported parts switched quickly from China to Taiwan after the 2018 tariffs were imposed.

3.48   Yakima products are required to meet federal and automotive manufacturer safety and testing requirements to ensure the recreational equipment (bicycles, cargo boxes, etc.) will withstand the forces created when attached to vehicles traveling at high speeds or over rough terrain.  They cannot simply be made anywhere to any production standards, but have to be adequately designed and manufactured.  Changing vendors and getting those vendors set up to produce quality products, or changing the factory would have taken time and work, but there was no corresponding transition effort during Mr. Stone's employment.

AMENDED COMPLAINT AND JURY
DEMAND - 10

Teller Law
1139 34th Ave
Seattle, WA  98122
(206) 324-8969  Fax: 860-3172

3.49     Based on Mr. Stone's prior experience and industry knowledge, moving the supply chain to do the steel and aluminum fabrication, welding, powder coating, etc. (which had been accomplished in China prior to the tariffs) to a new factory in Taiwan would take about 18 months. The transition was much quicker than that for Yakima.

3.50     Additionally, based on the duties and responsibilities of his position and his teams, he would have been involved if manufacturing had actually been shifted from China to Taiwan. Instead of merely changing data in the enterprise resource planning systems, or if there were actually new parts sources for steel and aluminum products produced in Taiwan instead of in China as previously. In addition, Relator's subordinate product managers would have been tasked with managing a series of transitions, including both administrative and testing processes for new parts. Neither the Product Managers nor any other members of Mr. Stone's teams were involved in the transition from China to Taiwan.

3.51     Relator travelled to both factories in 2019 and saw that metal bike rack frame parts were welded, powder coated, and assembled, i.e., nearly fully produced in China, and that some light assembly and packaging was taking place in Taiwan. That is, as of August 2019 a significant amount of assembly was still happening in China, and these sub-assemblies and China-sourced components (bolts, nuts, etc.) from Nanjing were shipped to the Kaohsiung Taiwan factory. The metal framework, components, and sub-assemblies from China make up the essential character of the product and do not change the HTSUS Code, nor meet the substantial transformation requirements to alter the country of origin.

3.52     Final assembly and packaging of these sub-assemblies and components does not constitute substantial transformation, and the value of the injection molded plastic parts is significantly less than the value of the fabricated steel or aluminum parts. These are bike rack and cargo box parts before being assembled, meaning they should have the same HTSUS codes, and are not substantially transformed. Nor are the processes taking place in Taiwan able to add

AMENDED COMPLAINT AND JURY
DEMAND - 11

Teller Law
1139 34th Ave
Seattle, WA  98122
(206) 324-8969   Fax: 860-3172

the substantial additional value required to change the country of origin to Taiwan.

3.53   The part numbers imported from Taiwan have backbone framework and components made in China with limited injection molded plastics from Taiwan.  The small sampling of part numbers below are, on information and belief, among the highest volume parts coming from Taiwan.  This is not intended as an exclusive list.  Additional part numbers in each of the forgoing product categories have very similar construction and have likely been subject to the same treatment.

| Part No. | Name |
|---|---|
| 8004073 | Jaylow |
| 8002103 | Frontloader |
| 8002098 | Forklift |
| 8002635 | Halfback 2 |
| 8002636 | Halfback 3 |
| 8000425-430 | Jetstream bar – several sizes |

3.54   On information and belief, nearly all parts and products for which Defendant changed the Country of Origin from China to Taiwan in the period since the imposition of the above-referenced tariffs are in fact misclassified, with the proper Country of Origin remaining as China, not Taiwan.

3.55   According to Customs Ruling NY N306015 (9/20/2019), the proper HTSUS classification for bike racks which are attached to cars by way of the towing hitch is 8708.99.8180 and according to Customs Ruling NY K84952 (4/9/2004) (and others) the proper HTSUS classification for bike racks which are attached to cars by adjustable straps is 8708.29.5060.  Neither category is subject to any permanent exception for the additional import tariffs from China.  Rather than the standard 2.5% tariff on imported goods, such goods coming from China have an additional 25% tariff.

3.56   Similarly cargo boxes for cars are classified under Customs Ruling NY A82373

(5/24/1996) under classification 4202.92.9026 or 4202.99.9000 by Customs Ruling NY G86615 (1/31/01). Neither category is subject to any permanent exception for the additional import tariffs from China. Rather than the standard 2.5% tariff on imported goods, such goods coming from China have an additional 25% tariff.

3.57   Roof racks for automobiles are also classified under Customs Ruling NY I84287 (7/17/2002) and HQ 964871 (3/9/01) under classification 8708.29.5060 or 4202.99.9000 respectively. Neither category is subject to any permanent exception for the additional import tariffs from China. Rather than the standard 2.5% tariff on imported goods, such goods coming from China have an additional 25% tariff.

3.58   None of these categories is subject to exception for the import tariffs from China, other than a temporary exemption from March 20. 2020 through August 7, 2020 for trailer hitch mounted bicycle racks (see Chp 99 HTS Code 9903.44.43) and for roof racks made of steel (not aluminum) from April 24, 2020 through December 31, 2020 and October 12, 2021 through December 31 2022.

3.59   Yakima's misclassification of the Country of Origin of the foregoing products and any others was intended to avoid payment of tariffs it should rightfully have paid, and was done knowingly, as that term is defined in the False Claims Act.

**K.   Intentional Scheme or Plan**

3.60   Yakima is responsible for the actions of its managers, agents, and employees which were taken for its benefit.

3.61   As a result of the above, Yakima paid less than it knew it should have in import tariffs.

3.62   As referenced above, tariffs were due from Yakima in much higher amounts than if accurate information had been included in the prior disclosure, and if the proper Country of Origin (China) had been identified.

3.63  The purpose of the above-referenced scheme was to retain government money for Yakima to which it was otherwise not entitled.

3.64  Defendant Yakima, acting through their agents or employees, knowingly took the actions identified herein, and knowingly and intentionally caused to be presented to an officer or employee of the United States Government, false or fraudulent claims for approval.

3.65  Defendant Yakima, acting through its agents or employees, knowingly caused a false statement to be made and/or used in order to get a false or fraudulent claim approved by the Government to its detriment.

3.66  Defendant Yakima, acting through its agents or employees, conspired with other parties to defraud the Government by getting a false or fraudulent claim allowed or reduction of amount owed.

3.67  Defendants made these false representations of material fact knowingly as that term is defined in 31 U.S.C. § 3729(b).

3.68  The false representations were believed by the government and acted upon by the government to its damage and detriment.

3.69  The government's reliance on the statements in the prior disclosure and statements about country of origin were reasonable and it had a right to so rely.

3.70  These practices resulted in lower tariffs paid than were legally required, and resulted in Yakima retaining more money than it was entitled to because of the knowingly fraudulent actions of its employees and agents.

3.71  These fraudulent practices have been ongoing and continuing for a period of years.

3.72  The practices identified herein have been ongoing and are not isolated to the example(s) identified herein.

### IV.  CLAIMS OF THE UNITED STATES

4.1  The facts stated above give rise to a violation of the Federal False Claims Act, 31

AMENDED COMPLAINT AND JURY
DEMAND - 14

Teller Law
1139 34th Ave
Seattle, WA  98122
(206) 324-8969   Fax: 860-3172

U.S.C. 3729(a)(1)(2)(3).

  4.2 The defendants are liable for the actions of their agents, and their employees under the doctrine of Respondeat Superior.

## V.  DAMAGES SUFFERED BY THE UNITED STATES

  5.1 As a proximate cause of the fraudulent practices described above the United States of America has suffered damages in amounts fraudulently retained by Yakima which should have been paid to the United States.

## VI.  PRAYER FOR RELIEF

  **WHEREFORE** plaintiff prays for damages as follows on behalf of the United States, and/or on his own behalf as appropriate:

**On behalf of the United States:**

  6.1 Economic damages in an amount to be proven at time of trial.

  6.2 A civil penalty in the maximum amount allowed by law.

  6.3 Treble damages as provided for in 31 U.S.C. §3729(a).

  6.4 Multipliers and civil penalties pursuant to tariff acts and customs regulations.

  6.5 Prejudgment interest.

  6.6 Reasonable attorney fees and costs.

  6.7 Whatever additional damages the court shall deem to be just and equitable.

## VII.  JURY DEMAND

  Relator hereby demands a jury.

DATED this 6th day of June, 2022.

_/s/ Stephen A. Teller_
Stephen A. Teller, WSBA #23372
Attorney for Relator Stone